Yes. 18-6202 Hinkle v. Beckham County Board. Mr. Olson? Yes, sir. If it pleases the court, my name is Brent Olson. I represent the plaintiff appellant, Mr. Laramie Hinkle. There's a lot of points we need to raise here, so I need to get to the main issues. The reason why I believe this case is significant is because, in my research recently, I have not seen a published decision from the Tenth Circuit Court of Appeals post the U.S. Supreme Court's decision in Florence v. Board of Chosen Freeholders that deals with when a strip search is appropriate. I believe that the lower court erred in its decision in finding that the strip search administered to Mr. Hinkle was constitutional because, I believe, the trial court overread the Florence decision, made it too broad, when, in fact, Florence did not address the fact pattern that dealt with Mr. Hinkle's arrest. He was not put in the general population, no charge for drugs or contraband, and under those circumstances, the Tenth Circuit's long string of precedents that would bar or ban a strip search under those circumstances were still in play, still good law, which we've presented. Well, does it matter if they knew yet whether he would be placed in general population? No, Your Honor, and I believe that's another fact that the trial court raised because, in Florence, the U.S. Supreme Court did not address whether the jail staff knew whether they were going or not, but this court has previously addressed that issue. You cite they're all pre-Florence cases, and obviously, now that we have Florence, we're going to be governed by Florence. Yes, Your Honor, but Florence did not specifically deal with the issue of whether the administrators know whether a prisoner is going in the general population or not. Their fact pattern was very specific, and it's laid out in majority opinion in that section four. It dealt only with prisoners in the general population, and Justice Alito conceded that, so that is where we are, and what the trial court did was drag the issue further in or over-read Florence to make it apply to this fact pattern, and my contention is that the Tenth Circuit's decision, matter of fact, there was a case directly on point that was unpublished, Ellis v. Sharp, 30 F. 3rd, 141 from 1994, basically said if the county did not know the length of time that a plaintiff would remain in jail, that did not matter in terms of the Fourth Amendment analysis. Administrative ignorance did not trump the Fourth Amendment in that case, and that is my main concern about what the lower court did. They're trying to make administrative convenience trump the reasonableness of the Fourth Amendment against strip searches, which this court has said is very humiliating and is very intrusive, and we have to make the Fourth Amendment alive and not subject to administrative convenience, and I'm saying please follow this court's precedent that was laid and the boundaries of Florence because we have not gotten there yet. Are you contending the Fourth Amendment requires a jail to have a segregated portion for detainees who likely will not go into the general population until it's determined that they will? Judge Phillips, there was a long string of cases from the Tenth Circuit developed in 1984 that prohibited strip searches across the board, indiscriminate searches, and given that precedent and how the court has interpreted the Fourth Amendment through time, it's the Fourth Amendment that we're guided by, not administrative convenience, so my contention is the Fourth Amendment does bar indiscriminate strip searches as defined by this court through the years, which means the court first looked as to whether the prisoner was in the general population. If it was not, then the court said you do not strip search that prisoner unless there is a suspicion of drugs or contraband. That's the way I read it. After Florence, isn't the test whether the search is reasonably related to a legitimate panological interest? That is confined to prisoners that go into the general population. You think that that test from Florence has to be read so narrowly that it only applies if the prisoner ultimately ends up in general population? That is the way I read the text of the majority decision, again under Section 4's disclaimer and Justice Alito's concurrence. The court has not gotten to there yet, therefore we should not rush to make those requirements ahead of time. Again, I would say your precedent is the one that controls today because the court has not overruled that bias. What if the prisoner is held in a holding cell with other prisoners who will go into general population and you know they will? Is there some interest in making sure that there's no contraband that can be transferred from prisoner A to prisoner B? That concern is remedied by what happened to Mr. Hinkle under our fact pattern. They have the ability to do a pat-down search and Mr. Hinkle was given a pat-down search and I believe in other instances where the court has found across-the-board strip searches unreasonable is in situations where there are pat-down searches and no contraband is recorded. Now if you also look further at Florence, they talk about gang activity. Not here. We don't have any gang activity going on in this instance. So that's why I think Florence is so narrow here. If I can address another major issue, which is ... Before you leave the search, is it significant that there was a search of the beard for purposes of Florence? It is because Florence said and one of the exceptions that we will look at is when a prisoner is indeed touched and here it is undisputed that the beard of Laramie Hinkle was touched by the person administering the strip search, if you will. So he falls under that exception in Florence because of the touching. Thank you for bringing that point up. The other thing that is of huge concern is what constituted probable cause and as you've read in the brief, we contend that the evidence was twisted to frame Laramie Hinkle for the theft of a trailer that happened almost 10 years earlier. We can't look at subjective motivations. It's going to be an objective review of the facts and circumstances here, right? That is correct, Your Honor, but here under, if most recently in the Hart versus Board of County Commissioners case, which Judge Phillips was also involved in 2016, you don't have to have direct evidence of intent. Where the issues come is when you look at how the evidence supporting probable cause is not truthfully presented or if it's twisted in a reckless fashion. And here we have the conversation that took place between Deputy Estep and Laramie Hinkle on recording where they try to twist this right statement into saying, well, you affirmatively said that you own this trailer and he's saying, right, I'm listening to you. Well, you have the pastor and the insurance company representing, there's a stolen vehicle, there's some trailer, there's some linkage to your client, Mr. Keown. Mr. Count or Count Keown, I believe this is the right, yes. Keown said that Hinkle owned the trailer. Maybe the conversation with Estep was vague, but you do have a stolen vehicle and a claim that Mr. Hinkle owned it. Why isn't that? All right. We're probable cause. It's not proof beyond a reasonable doubt or more likely than not at this point. Understood, Your Honor, in that respect. But here's one thing. You've got the three-year statute of limitations here. That's why I put emphasis on. Well, the statute of limitations is an affirmative defense that you can raise. It doesn't really fall into the assessment of probable cause, does it? I mean, every circuit to look at it is ruled against you on that, haven't they? No, not in Oklahoma. There is no case law developing the statute of limitations with a property damage clause. It is a statute right there. In terms of affirmative defenses, yes, when you're evaluating where the probable cause takes place, you have to look and see, and a timeline is very clear. When did the theft statute accrue? When did it begin hunting? When at the commission of the crime, which would be when the vehicle was originally stolen. That's when the concealment would have taken place. Didn't the crime occur when it was brought to Oklahoma? No. No, it wouldn't have been commissioned in Oklahoma. It would have been initially commissioned in theory, South Carolina where it happened. Wouldn't a crime of possession have occurred when it was brought into Oklahoma? It would. Tell me where I'm wrong. We have no idea when that took place, Your Honor. That's speculative. We do know when the trailer originally- If it's speculative, then how does that undercut the determination of probable cause? Couldn't the officers believe that it had been less than three years since it had been brought to Oklahoma on what we know? No, because if you go by what the insurance agent data and the information when the alleged theft occurred, I believe it's in September of 2006, if I'm correct. Yeah, but the record doesn't say when the trailer was brought to Oklahoma. No, there's an absolute gap there. That's what, again, it's speculative. That's on the state to demonstrate. But the other thing that undercuts probable cause here is, as we point out under Oklahoma law, it is mere possession of recently stolen property. See, that's significant as well. Recently stolen property does not support a conviction. You have to have more. They couldn't even show he had control over that trailer. They tried to engage him in that conversation, well, will you sell it to us? He goes, I've got something else going on. You can't even prove constructive control in that conversation. Well, he acknowledged that there was a trailer on that property that he had some interest in. Your Honor, the way I read the transcript of that conversation, he was just saying yes, acknowledging the gentleman's statement. I think he'd be reading too much to say he was agreeing with the truthfulness of the he was going undercover disguising who he was. Well, that's not what he says because later he doesn't say, I was just saying okay to your statement. He says, I misunderstood what trailer you were talking about. I do own a trailer, but it's not this trailer, which suggests to me that when he sent right and he was confused about the trailer, he was indicating that I own the trailer. Your Honor, I believe that's a different take on that. And again, I believe the interpretations that you're throwing to me support the argument that this should be a fact question for the jury to determine as to what is probable cause because of the way this fact pattern has been so spun and that there's inferences that go both ways on this. But either way. Well, what do you understand is required for probable cause? You're talking as though it's a preponderance or something greater than a preponderance. What's your understanding of the standard? More likely than not. You think it takes more likely or not to have probable cause? Well, you have to have some evidence that a crime has occurred. It's not based on speculation, but there has to be credible evidence that a crime has occurred. Can that be substantially less than preponderance of evidence? It is less than the preponderance of evidence standard, yes, Your Honor, but it has to be credible. And we have some facts here that just can't be ignored. And it turns out they're mistaken. The insurance company says the VIN numbers match. That's a huge fact. They call the church in Anderson, wherever it was, anybody you know in Oklahoma who might have the trailer and they identify Mr. Hinkle. But that doesn't mean a theft occurred based on that conversation. Well, we know there was a theft because the trailer had been reported as stolen and insurance proceeds had been paid on it. Let me choose my words a little quickly. That doesn't mean that Mr. Hinkle or Mr. Keown stole that trailer. There was nothing that the law enforcement or the pastor said they were the ones who did it. They were just asked who in the congregation may live out in South Carolina. There was nothing where the pastor said they stole that vehicle then. There has to be evidence that's not based on speculation, but here's the problem, though. This conversation was manipulated to where the yes or the right, excuse me, the right word was spun, interpreted as saying, yes, I affirmatively own this trailer. And here's the other issue, that there was exculpatory information that was provided Deputy Estep right there when Mr. Hinkle is arrested. He says, I own a open trailer, not a closed trailer like you're trying to say. That was exculpatory evidence that was available at the time. And while they were waiting three hours to talk to Mr. Keown, Estep did nothing to investigate that exculpatory evidence whatsoever. And therefore, under the precedent of this court, under the Batiste case, you can overturn probable cause or in the alternative, it becomes a jury question to be determined under these circumstances. Thank you, counsel. Your time's expired. Thank you. I appreciate your time and consideration. You may proceed. Your Honors, may it please the court. I am Wellen Poe. I represent Scott Jay and Strider Estep in this lawsuit. My co-counsel is Carson Smith. He represents the Board of County Commissioners of Beckham County. Mr. Smith will be addressing the issues related to the policy of the strip search of the jail. I'd like to leave at least five minutes or more time for him to address that. There were, in trying to prepare for this, of course, there were numerous allegations in the complaint, numerous allegations of error raised in the petition. I'm going to limit my comments, if it's okay with the court, to what counsel has spoken of today. There were issues also about First Amendment violations, retribution that were raised, and if the court would like to hear that, we'll address that. I think I'd like to address more the probable cause issue that was raised by counsel. Can I ask a question as you get into that? As I understand the sequence of events, there was some back and forth, but when you turn to the traffic stop, Mr. Hinkle's pulled over, he's then given his Miranda rights, agrees to answer questions, and at that point, as I understand the record, he told the officer that Mr. Keehan owned the trailer that was on the Smith property, and the officer then called Keehan, and Keehan said, yes, I own the trailer, right? That is correct. At that point, there's a lack of really clear claim of ownership, and I know there's been some back and forth, but why wouldn't a reasonable officer want to either complete an interrogation of Keehan, or I guess what I thought might happen is ask to see the title to the vehicle to prove ownership. But it just seems to me at that point, the facts point to Keehan predominantly and not to Hinkle. Well, they also still pointed back to Hinkle, but yes, and officer, the deputy did contact Mr. Keehan and say, Mr. Hinkle is now saying this is yours. Mr. Keehan makes some comment that maybe it is, says I'll come and visit with you. They wait three hours for Mr. Keehan to come and be interviewed, come and be questioned, and he never shows up. Keehan's incriminated himself with ownership at that point under that theory of the case. That's correct, Your Honor, but that does not destroy the probable cause that Strider East had already had for Mr. Hinkle. Why doesn't that dissipate? Maybe at some point, Hinkle was on the hook for ownership based on this telephone conversation, but once McKeon claims ownership, doesn't that dissipate or at least undercut the reasonableness of arresting Hinkle at that time without further investigation? No, Your Honor, based on Mr. East's experience, he even ran the scenario by the district attorney and ran the exact scenario of what had occurred out there at the scene, and she said you still had probable cause to arrest Mr. Hinkle. Now, why it didn't destroy the probable cause of Mr. Hinkle is that Strider, as an experienced officer, is well aware that people will volunteer and say, yes, I own something when I'm trying to sell it. However, when it comes time and an issue comes up that, well, maybe the police are looking at it, then all of a sudden they back up and say, I didn't mean that, and that's from his experience as a law enforcement officer. Yeah, and you don't make an arrest at that point, do you? I think you do. You still have probable cause, and maybe he could have not made an arrest and done more, but that did not defeat probable cause, and the issue of whether the arrest is proper is whether at the time of the arrest the deputy had probable cause to arrest Larry Hinkle, and he did in this case based on all of the factors that had been set up to that date. The probable cause as far as a stolen trailer, I see that, but in regard to Judge Tempkowicz's point, it seems like a pretty solid one that once the deputy learns from some other person that person has made this statement that that's my trailer, which you wouldn't expect if it's a stolen trailer, that that at least calls for a timeout and not an arrest. Mr. Keehan had also previously told Mr. Eastup that Mr. Hinkle owned that trailer, so now you have two stories from Mr. Keehan. You also have the other information, all of it pointed to Mr. Hinkle, and Mr. Hinkle's conversation with the deputy, I know it's been characterized, it's been manipulated or misinterpreted, but when he had the conversation with Mr. Hinkle about the trailer, and do you own the trailer, I'd like to see that trailer, and Mr. Keehan told me that that's yours, the answer's right, Mr. Eastup had every right to ... It was reason for him to understand that that was a yes, an affirmation under the context of that conversation that Hinkle owned that trailer, so you have opposing stories which doesn't defeat probable cause. You're not recognizing how this thing evolved. You're seizing on a moment in time and then not considering what happened after that. One of the things that happened after that is the deputy found out there were two trailers, one covered, one uncovered, which explains the call. And can you be as specific as you can and tell me after the father-in-law had said that's my trailer, what was the probable cause? Not that the trailer was stolen, but instead that it was Hinkle who had stolen it. What is it? Well, if you take Keehan's statement only, then you're taking out the context of everything that's up to that point. All I want to know is after that statement was made, what was the probable cause that said it was Hinkle? Well, you still have Mr. Hinkle's prior affirmation that he owned that trailer. And now, if Mr. Keehan says no and Mr. Hinkle changes his mind later and says no, then that still doesn't defeat what was probable cause. It now becomes an issue that probably needs to be sorted out in front of a court at some other point. But it was probable cause at that point in time to still arrest Mr. Hinkle at that time. And Judge Tinkovich, as you said, it might have been more prudent for the officer to say, okay, let's take a timeout and see. But as I said, the issue is whether probable cause existed at the time of that arrest. And based on the facts that he knew at the time, probable cause did exist for that arrest and it was a valid arrest, even through the guidance of his local counsel who was the DA's office, the district attorney at that point in time. What's the, why isn't the statute of limitations property crime? Can you help me out on that? You know, this was a 2003 theft, $3,000 worth of property. It's on a farm or ranch in Oklahoma now. When was the crime committed that Hinkle was arrested for? Well, he was ultimately charged with concealing stolen property. And concealing stolen property by statute is a crime, has a three-year statute of limitations when it is discovered. The concealing of the stolen property would have been when it was found on the property, when it was determined it was stolen and it was determined that Mr. Hinkle and or Mr. Cohen were concealing that. And you can conceal property in the open, it doesn't have to be hidden. So the concealing was found, was determined in May of 2000, in May of that day and that would have been started, the statute of limitations. The statute under that, under the Oklahoma statute starts when the crime is found to have been committed and the concealing would have been in May of that year. Who brought the trailer to the Smith property? The record is unclear on that. Mr., we don't believe it was Mr. Hinkle, most likely as it's turned out in depositions, most likely Mr. Cohen. But he has never, he has never shown up anywhere. Didn't Rod Smith tell ESSEP that Keehan had brought the trailer to their property? I believe he said that Mr. Keehan was doing work for them and brought the trailer, but Mr. Smith and the family also said that they didn't know if it belonged to Mr. Keehan and Mr. Hinkle because both were doing work at that place. Wait a minute, what did they know at the time of the arrest?  They would have known what Mr. Smith told them, but that doesn't mean... Well, did Mr. Smith implicate Hinkle at the time of the interview? He said, I don't know, we don't know if the trailer belongs to one of them, it belongs to one of them because both of them have been doing work on our property. We believe it belongs to either Mr. Hinkle or Mr. Cohen. Where's that in the record? Where am I going to find that? I believe that is in the summary judgment motion.  No, no, no. And that was the initial, because that was the initial contact by the Smith family to the deputy who called the deputy and said, it's one of those two, both of them have been out here. I want to focus you on the press release. I can understand why when you have a former law enforcement officer involved, you want to get out ahead of the story, but two years after Mr. Hinkle was cleared of all charges and released, that press release is still on your website telling the world that he had committed, was arrested for these crimes. Doesn't that strike you as problematic? No, at the time it was posted, it was true. Mr. Hinkle has admitted that the contents within it were true. So there's no obligation whatsoever when you find out it's not true to take it down. I don't, it is, it was part of a record that stays out. And in fact, if I go online today, I can find it even though the Sheriff's office is long gone, that website has been gone. They did not ever pull any of the, the postings that were done. And the issue on that, your honor, as I understand it is not whether it's, it's whether the it was posted in retaliation for Mr. Hinkle supporting Gail Wilhite in the election. Not whether the posting was proper or not proper, but whether it was posted in retaliation. And I think the fact's clear that it didn't as the court found. So the issue, whether it stayed up there or not, as long as it wasn't done in retaliation, that is what the allegations were against Mr., against Sheriff Jay, is that all that was done in retaliation. Not that it was left up, but that it was left up in retaliation. So, so long as it's not motivated by retaliation, it's fine to leave up on your website, stories about people charged with crimes where they're then exonerated. There were others, and I would say in the broader question, I don't think the court has to answer that in this, in this circumstance, it deals with retaliation and that would be proper. So, if the court has any further questions, I will yield the rest of my time to Mr. Smith. Thank you, counsel. I think we have Mr. Smith here. Mr. Smith. Yeah, welcome. Good morning, your honors. My name is Carson Smith. I'm here for Beckham County Board of County Commissioners, i.e. Beckham County. I want to jump right into the strip search issue. Appellant's counsel claims that the district court overread Florence, on the contrary, I think the district court had a thorough and nuanced understanding of Florence and Florence's rationale and even the spirit of Florence. Florence is a tour de force of the difficulties in operating a county jail. It is a guidepost in the wisdom in deferring to correctional officials in that they know their facilities, they know the typical population, they know the building structure and the risk posed thereby. And Florence canvasses all of that. And I believe that one of the key points of Florence is noting that the task of determining whether a policy is reasonably related to legitimate security interest within the peniological interest as you stated earlier, your honor, is peculiarly within the province and professional expertise of correctional officials. Florence goes on to examine in a very disciplined way the booking officer's job at the moment the strip search is decided upon and focuses on the practical realities therein. Florence stands for the proposition that there must be readily administrable rules at that moment in time. It uses the term unworkable for the petitioner's proposition there that that booking officer amidst all the other pressing realities in the jail should have to make kind of an ad hoc determination of whether this particular crime is violent enough or serious enough to warrant a strip search. And so the gritty reading and focus of Florence is yoked to the time that the strip search is decided upon. So I would differ with the appellant's counsel that you can just look through a hindsight analysis and look at the paperwork. That doesn't comport with the rationale of Florence. It also seems to be a rather mechanical approach proscribed by Florence. Well here the county had a policy that if you're a former law enforcement officer, you're not going in general population, right? And so at the time of the strip search, I assume they knew Mr. Hinkle was a former law enforcement officer. Would that suggest that under Florence that here they're exaggerating their response to the considerations where they know he's not going to go in general population? I understand the question, Your Honor. It wasn't so much of a hard and fast policy as it was kind of a common practice. But that practice had to be worked out each time with phone calls to the judge and so forth. And so even though if it was suspected in the upper ranks of officials that the person would not go in, quote, general population, I think just looking at that term in the abstract and the nomenclature of that term misses the point of Florence. The point of Florence is without substantial contact with other detainees, that wasn't possible with the Beckham County Jail. And so therefore I think it's proper within the framework and rationale of Florence. Your Honors, I see my time is up. Would you like me to finish my answer today? Go ahead and finish your answer. And so the fact that he is former law enforcement, in the context of other jails, which did have the structural and operational ability to fully segregate that individual from other inmates, then I think you would be coming within the Archuleta case where you have the true person that is either awaiting bail and known to not be admitted to the back of the jail. You would come under the Warner case, excuse me, Warren case, where they had a practice of sending all females outside. And so there was no possibility of, quote, being admitted to the general population. Here, Laramie Hinkle was being admitted to a population that would inevitably entail substantial contact with other detainees, given the realities of that jail.